All right, fourth and last oral argument we'll hear this morning is docket number 23-2369, Walters v. HHS. Counsel, please begin whenever you're ready. Good morning, Your Honor. Thank you. Good morning, Your Honors. May it please the court. My name is Phyllis Widman, Widman Law Firm. I represent Ansel, Shakima, and KSSW Walters, KSSW being the minor child in this case who was injured by the vaccine. I'd like to begin at the end. Excuse me. And what I mean by that is in looking at the whole case after trying the case and going through the motion for review and now being here today, I think that it is summed up in the way that it appears that the court and then the reviewing court in its affirmation kind of jumped to the alternate cause or the other potential cause of KSSW's epileptic encephalopathy and intractable seizures and ultimate horrific demise at this point, first under Alton, and then after petitioner meets the Alton requirements by preponderance of the evidence, not 100%, then the burden does shift to respondent to prove whether or not there's a factor unrelated to the injury that could have caused the injury, but instead of the vaccine. So not the vaccine, but something else. What I mean by kind of jumping to the end is that the opinion of the trial court seemed to go to KSSW's very rare genetic abnormality or abnormalities and assign his intractable seizures and other disorders to that genetic abnormality or those abnormalities, rather than first looking at the case in chief, reviewing the case under Alton under the proper procedure and burden of proof, and then allowing that shifting of the burden. In our assertions, we state that in doing so, the special master did not therefore kind of demand the putting forth of the arguments by respondent that the genetic abnormalities were the cause of the seizures. In other words, there was no direct evidence that the respondent needed to put forward. Rather, the special master just kind of went to that as the cause. I'm trying to understand a little bit about, in terms of process, how your affirmative case for a prima facie case was presented. It appeared that you relied pretty heavily on the chromosomal abnormalities as being a part of the overall causation picture, and that it was also part of your argument that those abnormalities by themselves could not have led to these injuries. And so I guess what I'm trying to say is, although ordinarily these other unrelated factors is something that isn't up for consideration until after the prima facie case has been made, and then the burden shifts to the government, it seemed to be that it was your side that introduced the whole question of what was the role of the genetic abnormalities into the prima facie case, and therefore it was for that reason that the special master had to undertake this evaluation up front in the prima facie case. Is that right? Well, Your Honor, I don't believe that that is the reason why the special master kind of took that as being part of her determination. It is true that we did put forward the quite obvious situation, which was the genetic abnormalities, but our case the entire time was that the vaccines, or the vaccine in particular, the DTaP, triggered this autoimmune response or this inflammatory response, and that, yes, the abnormalities existed and may have therefore primed KSSW to have that reaction, but that by themselves or on its own as abnormalities, they would not necessarily have caused his condition. And when I say not necessarily, it's because when the burden does or is supposed to shift to respondent, they then also have by preponderant evidence the requirement to prove that the factor unrelated, that being the abnormalities themselves, are the cause for the condition. But that didn't happen. It didn't kind of materialize the way it was supposed to upon our showing of our case. And if your honors allow me, I can kind of say that, or I can articulate this by breaking it down a little bit, and in looking at the special master's decision and then the reviewing court's decision, it seemed that there were kind of issues that fit into the outcome or the result that desired by the courts, which was to blame the abnormalities on, or to blame the abnormalities for KSSW's condition. So one of those examples is that we, and we set forth all of this throughout the case, the special master weighed the evidence and used the kind of the case law and the standard to weigh the evidence through the experts. And we assert that there was an admission by respondent's expert, Dr. Baronano, that she was just speculating that these abnormalities were the cause of KSSW's condition. Ms. Wooten, your position was that, yes, this chromosomal abnormality existed. However, it was the introduction of the vaccine that created the circumstance that we see now, that aggravated it. That's correct, your honor. Yes. But throughout the case and certainly in the decision and then the affirmation... So the question is, is that what happened, which is your position, or is it the position, or is it the case that the abnormality alone is what led to this situation? We assert the former, your honor. Right, no, I understand, but those are the two things that are positive for us. Yes, and then when weighing the experts and their opinions, the respondent's expert speculated throughout the whole case because of how extremely rare and unique these particular abnormalities are. That was another part of this case that's unusual, and that is that the type of chromosomal abnormalities that KSSW has when they are put together... Well, I'm sorry, it's actually that respondent's doctor put them together. So there were a few different mutations within KSSW's genetic code or makeup, and Dr. Baranano on the respondent's side states that there wasn't much literature at all, and therefore, and this is in her testimony, she pieced together one piece of mutation, let's call it, and that literature and whatever she could find out about that particular part of the mutation together with the other piece of mutation and whatever she could find about that. She did say that on cross, and in doing so, she came up with this opinion that it has to be that these seizures and everything else that follows would have happened anyway, even if the vaccine were not introduced and triggering it. So as you know, we look at this through kind of the lens of the four-pronged often factors, and which of the prongs do you say went wrong here? In other words, what you've just described as to your position in the case, which often prong does that play into, if you will? Do you understand what I'm saying? I do, and we do state that the third prong, which is the timing and onset, was not hardly at all addressed by the court, and that it's very solid, that evidence that the timing is there from the time that the case is talking about the vaccine, but to answer your Honor's question, the prong that applies to that piece is prong one, which would be the theory, the medical theory of the case. So in your view, that's the key prong in this case, prong one. Yes, well, prongs one, two, and three, but in that regard, yes, prong one. The special master concluded that you didn't meet your burden on any of the prongs, is that right? That's correct, Your Honor. I know you're going into your rebuttal, but could you just explain to me what was the case that you made for satisfying the first prong, the medical theory? The theory was mainly that the KSSW had a major inflammatory response and that his genetic mutations being what they were may have primed him to have, when the vaccine was introduced. Right. Weren't there some records that, I guess, the government consulted and said, well, if the theory is there's supposed to be some big inflammation response, we don't see, based on the testing, that that occurred. That was in dispute, yes, Your Honor, in the facts of the trial. There were records and there was evidence put forth, and mostly it was the first four days, really, that KSSW's vision was kind of his eyes, and I did submit these two videos, the before and after, Your Honors, for the court, but his eyes were jumping to one side that mom didn't really know that it was seizures or not, but she was extremely concerned and then sent the video to the neurologist, who said go to the emergency room immediately, and they did. So there was a quick time frame, even as that day, I believe, there was some vomiting or fever and reaction, and then it just got worse from there. So there was evidence in the record in the ER, but they didn't, as is typical, they don't always link the vaccine to this right when they're seeing it. They have an acute situation in front of them. He did stay in the hospital for several days, weeks, I think, even, and had seizures that were, they couldn't break them. So therefore, prong three, Your Honors, the timing and the onset, what we were discussing, and that is that the onset of symptoms was so blatantly obvious, yet the special master, and it was upheld on review, spent very little time on it, and the reviewing court in their decision, his decision, stated that there was kind of no need to spend a lot of time on prong three, which is the temporal onset timing, because prongs one and two weren't really met, and we need all three to have a case and to prevail. However, I do want to remind the court, which I know Your Honors know this, but it's by preponderance of the evidence for a petitioner, and we assert that we absolutely met, at least at a 51% preponderance standard, that our argument that there was a massive inflammatory response together with his genetic disorder, priming him for this response, that that, and our experts, of course, and Mom testifying to the timing met. Our court, though, we have to give a deferential standard of review for the lower tribunal's fact findings. Yes, Your Honor. I do know that, and I do want to just, oh, well, I, sorry, is this my rebuttal time? This is your rebuttal time, but if you want to make one last quick point, go ahead. Okay, thank you. I just wanted to mention that the experts themselves were not in equipoise at all, and that it was even by the testimony, I think I mentioned, but by the testimony of their doctor, that she didn't have any, many of the credentials that our doctor did, and that were very important credentials, specifically being an epileptologist, which was such a high fine, or I should say fine point in the case, and our expert, being an epileptologist, was able to read the actual EEGs and things like that, and their doctor admitted that she could not, and there were other things like that throughout the record. So I wanted to just make that point. Okay. Thank you. We'll give you some more rebuttals. Thank you. I appreciate that. Let's hear from the government. Good morning, Your Honors. May it please the Court. My name is Sarah Rifkin, and I represent the respondent, the Acting Secretary of Health and Human Services. Your Honors, petitioners do have my sympathy for the medical struggles their son has experienced, but his injury was not caused by a vaccine. I understand that petitioners disagree with the Special Master's findings, but this is no basis to overturn her very thorough 45-page decision in which she carefully outlines. What is the standard of review that we apply? Is it arbitrary and capricious? It is, Your Honor, and this Court has repeatedly emphasized that it does not reweigh evidence. It is repeatedly confirmed that the Special Masters in the vaccine program are entitled to a very high level of deference. They are experts. They do see extremely rare injuries with some frequency that wouldn't necessarily be seen in the general population. And so for that reason alone, they're entitled to a very high standard of deference, particularly when we're talking about factual findings. And with regard to the factual findings, I'd like to specifically turn to the Special Master's findings with regard to the chromosomal abnormality because I know that's a key issue in this case. In Stone v. HHS, this Court explained that Special Masters can't ignore the elephant in the room, where there's compelling evidence that something other than a vaccine caused a petitioner's injury. The Special Master can and should evaluate this evidence in evaluating petitioner's case in chief, and that's before the burden ever shifts to respondent to prove an alternate cause. Here, KSSW's chromosomal abnormality was that proverbial elephant in the room. Petitioners were not asked to rule out an alternate cause or disprove respondent's theory. They were merely asked to support their own assertions, and they failed to provide preponderant evidence in support of their own causal theory that the DTaP vaccine somehow interacted with the chromosomal abnormalities to cause KSSW's condition. So in that respect, the Special Master did not raise petitioner's burden. She simply held petitioners to their burden under the Act. And I want to highlight, Judge Chen, a point that I believe you had made. I think that's especially true here, where petitioner's own experts placed this chromosomal abnormality front and center, arguing that it somehow primed this child to have an abnormal immune response to the DTaP vaccine. So in our view, Your Honors, we can't fault the Special Master for considering evidence that petitioners placed into the record. I also want to touch on a comment that petitioner made regarding the Special Master's decision being somehow speculative. It was not, Your Honors. All of the experts in this case agreed that these chromosomal abnormalities, both the trisomy at 5P and the monosomy or deletion at 6Q, individually can cause seizures in up to 50% of patients. And I would refer to Appendix 44, a portion of the Special Master's decision, for a discussion on that point. But all of the experts, including petitioner's experts, agreed to this point. Dr. Baranagno, respondent's expert neurogeneticist, further testified that when we add these two defects together, we get an additive effect. We are likely to find in her clinical experience an even greater likelihood of neurogenetic defects and seizures. And unfortunately for KSSW, he was already seeing signs of these types of clinical defects. He was diagnosed in utero with genetic abnormalities. He was born with hydrocephalus that required a shunt placed in his brain. And at the time that he received the vaccine, he was actually at the pediatrician to undergo a preoperative appointment for another surgery to treat a tethered spinal cord. So also when we talk about, you know, the timing in this case and in terms of, I think, the tissue. Is there evidence in the record that people with only one of the two abnormalities that then got vaccinated were injured because of the vaccination? No, Your Honor, I don't think that we have that evidence in the record. What we do have in the record is evidence that these chromosomal abnormalities all on their own, with no environmental trigger necessary, can and do cause seizures in up to 50 percent of patients with these abnormalities. And what we see in KSSW's case is a combination of at least two abnormalities that our neurogeneticist has testified would create an even greater likelihood of side effects. And so along those lines, I guess I want to clarify. Your honors are not going to reweigh the evidence, of course, but I want to clarify this idea that we somehow had a healthy child vaccination and an abrupt change. And that's just simply not the case. KSSW was suffering from numerous brain and spinal injuries at birth. He spent some time in the NICU, required several surgeries. He did have a vaccine. And approximately 12 hours later, his mother testified that she saw him staring off to one side. She subsequently took him into the ER four days later. And at that point in time, a neurologist explained to KSSW's parents that he was likely having subclinical seizures even prior to vaccination. Subclinical meaning there were no overt signs that his parents could see, but there was still seizure activity in the brain. And that was observed on his EEG in the hospital. So I do want to clarify just this this picture from our perspective that this was not a healthy child who received a vaccine. And then suddenly, like a thunderclap, started experiencing seizures. And then I also, your honors, if I may want to make the point that even if we set aside the chromosomal abnormalities, petitioners still have not met their burden on any of the three problems. We have a long line of cases in the program that established that the DTaP vaccine does not cause afebrile seizures. There is some evidence associated with a high fever that then triggers a seizure. But this child experienced afebrile seizures. And I would refer the court to Appendix 36 for a discussion of those cases. As your honors mentioned, we also saw no signs of inflammation, no treating physician considered. For instance, an autoimmune diagnosis or an autoinflammatory disease to explain this child's conditions and never treated him with such disorder. There were no overt signs of inflammation like low platelet counts, fever, as I mentioned, swelling, redness. We don't have any evidence of that in the medical record. And finally, the timing itself at 12 hours or beyond is insufficient to establish causation. And we know that timing, even if it were closer in time, would be insufficient to establish petitioner's burden. So in sum, your honors, the special master properly weighed all of the evidence in this case. She thoroughly considered all of the expert testimony and she correctly denied entitlement. I'm happy to answer additional questions. But I would respectfully ask that the court affirm the decisions below. Thank you. Thank you. Thank you. Can I? Yeah, please. Thanks. Thank you, your honor. I'll keep it brief. Just with regard to what Respondent's counsel just stated regarding the no signs of seizures or having that KSSW had signs of seizures prior, potentially had signs of seizures prior to the injury, that was a fact in dispute. It wasn't necessarily determined. And so from our position, he had no signs of seizures, even if it were subclinical. That was just potentially some opinion that was in dispute. Also, your honors, I just want to point the court to the fact that I listed many cases from 91, 92, and 93, and then into 1999 all through 2011, where this court in particular reviewed lower courts' decisions such as these and made almost 100% of the time in those cases determined that the cases should be reversed. I cited a lot of those cases in my brief, and I have them separate here, too, for your honors, which I can make mention of a lot of them now or not, but I can just refer to them in my brief. With regard to that… They're all noted in your brief. Yes, your honor. And almost all, and I'm now going to actually just kind of lump them together when I make this statement, but they often say things like, and these are the decisions from this court, that the court emphasizes that absolute certainty is not required and circumstantial evidence can be enough with regard to the burden of proof for petitioner. Speculation is also not sufficient, and that's throughout Pisano and KG and a few of the other cases, and I referenced that actually in the reverse going back to Respondent's doctor, who continued to speculate on her opinion. The other point I just want to make, your honors, quickly is the trial court did, in her decision, talk about on its appendix 44, which coincidentally Respondent's counsel actually said while I was looking at it, but the trial court does state in her decision that Dr. Shafrir and Dr. Akbari, who are petitioner's doctors, provided no foundation for their assumption that the dual chromosomal abnormalities suffered by KSSW would have no additional effect. That is a reversal of, well, we assert it's a reversal of responsibility and burden of proof. It's sort of in the inverse for a petitioner to disprove it, that it was the abnormalities, before we ever even finished petitioner's case and then moved on to Respondent's case. This is, again, going back from what I said in the very beginning, starting from the back and working forward. With that, your honors, I request respectfully that your honors reverse this matter. Okay. Thank you. Thank you, Ms. Widner. Thank you for the extra time.  The case is submitted and that concludes the court's proceedings for today.